NOT DESIGNATED FOR PUBLICATION

No. 113,760

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.J.C.,
DOB XX/XX/2012, a Female.

MEMORANDUM OPINION

Appeal from Jackson District Court; MICHEAL A. IRELAND, judge. Opinion filed December 31, 2015. Reversed with directions.

*Randy M. Barker*, of Holton, for appellant natural mother.

*Heather Schrick*, of Topeka, for appellee.

*Alexandria S. Morrissey*, of Holton, guardian ad litem.

Before SCHROEDER, P.J., PIERRON, J., and HEBERT, S.J.

*Per Curiam*:  In March 2014, N.L.T., the maternal grandmother of 2-year-old A.J.C. filed a private child in need of care (CINC) petition alleging that A.J.C. was a CINC. Grandmother alleged that A.J.C. was without adequate parental care, control, or subsistence, was without care necessary for her physical, mental, or emotional health, and had been physically, mentally or emotionally abused or neglected by E.C., her Mother.

In the petition, Grandmother made a number of allegations. She asserted she had obtained custody of Mother's two older children in 2006 as a result of Mother's drug use. Later, it was disclosed that Grandmother was custodian of Mother's three sons, ages 6, 11, and 12. The record does not indicate that Mother's rights to these children were terminated and the district court did not take judicial notice of any prior CINC cases.

1

Grandmother further alleged she had seen and heard things leading her to believe Mother was actively using drugs, including methamphetamine. Several days before filing the petition, Grandmother had gone to Mother's work and retrieved Mother's car. She found all of A.J.C.'s belongings and many of Mother's belonging in the car. Grandmother believed that Mother and A.J.C. were living in the car. The next day, Mother contacted Grandmother and reported she had no idea where A.J.C. was. Finally, Grandmother alleged that Mother's current boyfriend had told her he and Mother would take A.J.C. and flee the state. Based upon these allegations, Grandmother contended an emergency existed and A.J.C. was likely to sustain harm if not immediately removed from Mother's home. Grandmother requested the magistrate court find that A.J.C. was a CINC and order an out-of-home placement.

Grandmother also filed an application for an ex parte order of protective custody reiterating her allegations from the CINC petition. The day the petition was filed, the magistrate court issued an order authorizing the removal of A.J.C. from Mother's custody and directing the child be placed in the temporary custody of Grandmother. The court also appointed a guardian ad litem (GAL) to represent A.J.C.

When Mother was served with the notice of hearing in the CINC case, she told the police officer serving the notice that she would not let Grandmother take the child and would instead go to jail. After talking to the officer more, however, she gave him the address of the babysitter watching A.J.C. The police took custody of the child until the Grandmother came to pick her up.

A temporary custody hearing was held on March 31, 2014. Mother appeared at this hearing pro se. At the magistrate's court's direction, Mother took a urinalysis (UA) test, which, according to the journal entry, showed a "faint negative" test for methamphetamine. However, the court services report included in the record indicated the test results that day were negative for THC, cocaine, methamphetamine, and a host of

2

other illegal drugs. Still, the court found there was probable cause to remove the child from Mother's home, citing the allegations of her history of drug use and current symptoms and actions. The court also cited to the petition's allegations that it appeared Mother and A.J.C. were living in a car and there had been a threat that Mother and her boyfriend would take A.J.C. and flee the state. Shortly after this hearing, the court appointed Mother counsel. The court granted Grandmother temporary custody of A.J.C. and allowed her full authority to make decisions as to "if, when and where" Mother could visit the child.

At a subsequent hearing, the magistrate court ordered Mother to provide another urine sample for a UA test, as well as a sample for a hair follicle test to be completed before the adjudication hearing. Mother again tested negative for illegal narcotics, including methamphetamine. Still, the court directed that A.J.C. remain in Grandmother's custody and that Grandmother should work with Mother regarding visitations with A.J.C.

An adjudication hearing was finally held June 20, 2014. Mother appeared at the hearing with counsel and the parties presented statements and evidence. Based upon whatever evidence was presented the magistrate court found A.J.C. was a CINC. The court directed court services to develop a permanency plan for reintegration, although Grandmother would continue to have temporary custody of the child. Visitation was to be extended to Mother at Grandmother's discretion. The court declined to involve the Kansas Department of Children and Families (DCF) at that time.

The court services officer (CSO) arranged a meeting with Mother and Grandmother to prepare a reintegration plan. The meeting was scheduled for July 15, 2014. Mother did not attend the meeting, did not call to reschedule, and failed to contact the CSO during the next 3 weeks. The CSO's report detailed Grandmother's allegations about Mother's actions before and after A.J.C. was born. As a result of Mother's failure to appear at the

3

meeting and failure to contact the CSO, the CSO opined that reintegration was not a viable option.

In August 2014, the magistrate court held a disposition hearing. Mother did not personally appear but was represented by counsel. The court found that reintegration with Mother was no longer viable and a new placement plan focusing on making Grandmother A.J.C.'s permanent guardian should be developed. To support this decision, the court cited to Mother's lack of employment, her on-going relationship with a physically abusive boyfriend, and her recent attempt to commit suicide. The record on appeal does not include a copy of the transcript from this hearing. It does not appear Mother ever requested this transcript for appeal purposes.

In September 2014, Grandmother filed a motion to terminate Mother's parental rights. Grandmother asserted that Mother was currently homeless and staying at a hotel in Holton. The motion reiterated Grandmother's prior allegations of Mother's history of drug abuse, her lack of a job and a home, and her living with a physically abusive partner. Grandmother also asserted that Mother had recently attempted suicide. As a result of a UA test in late September, the court was advised that the test returned an "extremely feint (sic) line" indicating a positive test result for methamphetamine.

The termination hearing was held in November 2014, at which Mother appeared with her attorney. During the hearing, the magistrate court heard testimony from both Mother and Grandmother. Prior to the testimony, Mother was ordered to take another UA test. The test was negative.

Grandmother testified that Mother and A.J.C. had lived in her home since A.J.C. was born. A.J.C. was very attached to Grandmother, her step-grandfather, and her siblings who at lived in Grandmother's home. Mother and A.J.C. had moved out of Grandmother's home several months before the CINC petition was filed, as Mother was

4

working at a restaurant in Topeka. Grandmother testified Mother contacted her in July 2014. She was distraught and reported she had been beaten by her boyfriend. Grandmother picked up Mother in Topeka. Grandmother testified that at that time, Mother also reported that she had tried to commit suicide and showed Grandmother healed cuts on her wrist. Based upon her prior experience with Mother, Grandmother also saw signs that Mother was again using drugs. Grandmother left Mother at a friend's house, where Mother had been living. Grandmother testified that Mother had used methamphetamine in 2009. Mother made no effort to go to any rehabilitation facility on her own initiative.

Shortly thereafter, Grandmother picked up Mother in Topeka and moved her to a hotel in Holton for her safety. Grandmother reported that Mother appeared to be using drugs again. Grandmother would not allow Mother in her home. Trying to find a safe location for Mother, Grandmother arranged for Mother to move to Iowa to stay with her brother. After moving to Iowa, Mother had contacted Grandmother a couple of times, but had not asked to talk to any of her children. She wanted to see the children at Halloween but Grandmother refused to let them travel to Iowa. Mother did not come to Kansas to visit them.

Grandmother did not believe Mother was emotionally stable enough to care for A.J.C. Mother had not made good decisions about who watched A.J.C. when she worked. During the time A.J.C. lived with Mother, the child had regressed in her potty training, had become withdrawn, and did not eat like she had. Due to Mother's history with drugs, Grandmother testified she could not predict whether Mother would start using drugs again. Grandmother denied ever hindering Mother's ability to see or communicate with A.J.C. Mother did not provide any financial assistance to Grandmother while A.J.C. was in her care. Grandmother was aware Mother had tested negative for illegal drugs at various times during the case, but she asserted that Mother failed a test in September 2014.

5

Since returning to Grandmother's care, A.J.C. had returned to her outgoing self, talking and hugging everyone. Grandmother believed it was in the child's best interest to terminate Mother's rights. Grandmother admitted that Mother held a job at a restaurant for about a year but Mother had told Grandmother she was fired for fighting at work. Grandmother did not trust Mother to be able to change for A.J.C.

Mother also testified. She admitted she had a drug problem in the past. Mother pointed out all of her negative drug tests, including a hair follicle test, but she could not explain how she received a positive test in September. Mother said she would choose A.J.C. over drugs and if A.J.C. was returned to her, Mother knew she could never use drugs in the future. Mother testified she was not currently using drugs, even though she had never gone through a formal drug treatment program. Being with her brother and his family in Iowa had helped because they were a good support system. She went to church regularly with them and was happy with her job.

Mother admitted she had not spoken to or met with the CSO to develop a reintegration plan. Mother testified that the day of the meeting was the day she (presumably Grandmother) came and took her to Florida with the rest of the family for a vacation. When she returned, the CSO was supposed to be going on vacation. Mother admitted that she never attempted to call the CSO and let her know what was going on.

In responding to some of Grandmother's claims, Mother testified she was fired from her job because another girl had hit her and the confrontation had led to them both being fired. Mother did not know why she had failed the September 2014 drug test and did not know what she could have taken to cause that failure. Mother denied asking Grandmother to come and get her in Topeka but agreed she had never argued with Grandmother about moving to Iowa. Mother admitted she had never tried to complete any drug treatment program and had never attempted to take any parenting classes.

6

Mother believed her work in Iowa, working with mentally handicapped adults, was comparable to parenting classes.

According to Mother, she continued to have contact with her boyfriend for a while after the case started. She testified, however, she had not been in contact with him for several months and he was no longer a part of her life. Mother admitted she had hurt herself when she was stressed out by all the events going on, but she did not want to die She testified it was a cry for help. She referred to Grandmother as a "psycho lady" taking her car, her child, and her job, and indicating she had a rough time.

At the time of trial, Mother was employed at REM helping to care for adults with disabilities who could not care for themselves. She had started the job October 2, 2014. She was there to help with their daily needs. For the last month, mother had worked an average of over 75 hours a week. She recently had received a certificate to act as a med manager, so she could administer and record medications her clients needed. She cooked for them, drove them to doctor's appointments, helped bathe them, and did general housekeeping. She had passed a background check for this job and she had disclosed that she had a felony conviction in Kansas. In addition to working, Mother coached her niece's third-grade volleyball team and she was scheduled to coach basketball.

Mother still lived with her brother, but hoped to get a place of her own soon and try to get A.J.C. back. Mother asked the magistrate court to provide her direction—parenting classes, drug treatment or anything it deemed necessary for her to obtain custody of A.J.C. Mother had received no help from a social worker during this case to guide her and was willing to find a facility in Iowa to continue UA testing. Since she had not seen the children at Halloween, Mother had sent them a package of candy and other things for the holiday.

A.J.C.'s father also testified, but only in agreeing that his parental rights should be terminated because he had no relationship with A.J.C. or Mother.

At the conclusion of the hearing, the magistrate court terminated the natural father's parental rights and took the issue relating to Mother's status under advisement. Approximately 90 days later, the court issued its ruling finding Mother was unfit and that it was in A.J.C.'s best interests to terminate Mother's parental rights. The court's findings incorporated the allegations in the pleadings as well as the testimony presented at the trial. The court noted that Grandmother had gained custody of Mother's three oldest children due to Mother's prior drug use problems. The court also found Mother had tested positive for methamphetamines on one occasion during the process. The court found Mother had chosen not to contact the CSO to participate in a reintegration plan, she had not voluntarily taken parenting classes, and had made little or no effort to communicate with A.J.C. The court found Mother's testimony about her new employment and stability in Iowa was not persuasive due to her lack of consistency.

Mother timely appealed from the magistrate's order to the district court under K.S.A. 2014 Supp. 38-2273(b). In an order dated March 17, 2015, the district court affirmed the magistrate court's ruling after reviewing the record and listening to the recording of the termination trial. Mother timely appeals.

Before terminating a parent's rights to a child, the district court is required to make three findings. First, the court must find by clear and convincing evidence that the parent is unfit. Second, applying the same standard, the court must find the parent's conduct or condition is unlikely to change in the foreseeable future. Finally, the court must find by clear and convincing evidence that termination of the parent's rights is in the best interests of the child. K.S.A. 2014 Supp. 38-2269(a), (g)(1).

8

When we review a district court's termination of parental rights, we consider "whether, after review of all the evidence, viewed in the light most favorable to the State, [we are] convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that [the parent's rights should be terminated.]" *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In *B.D.-Y.*, the court explained that "clear and convincing evidence" requires the factfinder to believe "that the truth of the facts asserted is highly probable." 286 Kan. at 697.

In determining whether a parent is unfit, the court must consider the nonexclusive listed factors set out in K.S.A. 2014 Supp. 38-2269(b) and (c). Any one of those several factors, if demonstrated, can provide grounds for the termination of a parent's rights, although termination is not required. K.S.A. 2014 Supp. 38-2269(f). If the court finds that unfitness has been demonstrated, it then considers whether termination of parental rights is in the child's best interests. K.S.A. 2014 Supp. 38-2269(g)(1); In re K.W., 45 Kan. App. 2d 353, Syl. ¶ 2, 246 P.3d 1021 (2011).

In this case, the original termination decision was issued by a magistrate court. Pursuant to the Revised Child in Need of Care Code, an appeal is taken to a district court. "The appeal shall be heard on the basis of the record within 30 days from the date the notice of appeal is filed. If no record was made of the proceedings, the trial shall be de novo." K.S.A. 2014 Supp. 38-2273(b). In this case, the record only consisted of the pleadings and the transcript from the termination hearing. No transcripts from other hearings were made part of the record.

The record before the district court, whose decision we review, is limited as to sworn testimony and admitted evidence. The record establishes that Mother tested negative for drugs, even with a hair follicle test throughout the case, except for a "very feint [*sic*] line" showing positive for methamphetamine in September 2014. Mother had worked at a well-established restaurant for nearly a year until A.J.C. was removed from

9

her care. Moreover, within a month of Mother moving to Iowa, she had obtained a responsible full-time position and was working a large number of hours without apparent problems.

Mother missed her appointment with the CSO to develop a reintegration plan and her explanation for that missed appointment is tenuous. However, the CSO made no further attempt to contact Mother and within a month had issued a report accepting Grandmother's statements at face value and recommending that reintegration was no longer viable. Prior to terminating her rights, neither the CSO nor the court directed Mother to perform any tasks—other than meeting with the CSO—to work toward reintegration.

It is undisputed that Grandmother had custody of Mother's three oldest children, ages 6, 11, and 12. However, there is no evidence in the record that there had been any other CINC proceedings or that Mother's rights had been terminated to those children. Thus, there is no statutory presumption of unfitness applicable in this case. While we recognize that giving a parent a reasonable time to adjust his or her circumstances must be considered in "child time," see *In re D.T.*, 30 Kan. App. 2d 1172, 1175, 56 P.3d 840 (2002), A.J.C. had only been out of Mother's care for 8 months when the termination hearing was held. During that time, A.J.C. was in her Grandmother's care and Grandmother had absolute discretion regarding Mother's visitation. Moreover, it was Grandmother who had moved Mother (without objection) to Iowa in September, making it more difficult for Mother to have contact with A.J.C.

Based upon the comparatively short period of time involved in A.J.C.'s case, the lack of effort on the part of the CSO (in the absence of DCF assistance) to make a serious effort toward reintegration, Mother's overall negative drug tests, and her efforts to maintain steady employment during the period in question, we cannot find the district court's findings that Mother was unfit and unlikely to change in the foreseeable future is

supported by clear and convincing evidence. We cannot find that the thrust of the facts asserted by the district court "is highly probable." *B.D.-Y.*, 286 Kan. at 697. Therefore, we reverse the district court's ruling and recommend the district court engage DCF in the process to ensure reasonable efforts to reintegrate the family are provided.

Reversed.